UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOSEPH DIMARTINO<br><br>**Plaintiff,**<br><br>v.<br><br>BMW OF NORTH AMERICA, LLC,<br><br>**Defendant.** | Civ. No. 15-8447 (WJM)<br><br>**OPINION** |

    This matter comes before the Court on Defendant BMW of North America, LLC's ("BMWNA") motion to dismiss. Plaintiff Joseph DiMartino ("DiMartino") has brought suit on behalf of a putative class, alleging unjust enrichment, monopolization under Section 2 of the Sherman Antitrust Act, and violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). For the reasons set forth below, the Court **GRANTS** Defendant's motion to dismiss.

## I. BACKGROUND

    The following facts are taken from the Complaint. (Docket No. 1-1.) DiMartino, a Florida resident, purchased a BMW 5-series car. The vehicle contains a N54 engine that Plaintiff alleges incorporated faulty fuel injectors—six Index 10 fuel injectors. Due to a failure of two of these injectors, DiMartino was required to bring his car in for an out-of-warranty repair. As part of the repairs, DiMartino alleges that he was forced to pay to replace all six of the Index 10 fuel injectors with Index 11 models. Such replacement was necessary due to a recall of all Index 10 models because of a systemic defect and an alleged incompatibility between the Index 10 and Index 11 fuel injectors. Moreover, as a result of BMWNA's monopoly on the aftermarket sale of parts, customers are allegedly locked-in to paying for a full set of Index 11 fuel injectors.

    DiMartino alleges that because of the need imposed by BMWNA to replace all fuel injectors and a monopoly on this market, BMWNA is able to profit from the sale of the additional, still functional, fuel injectors and consumers are forced to spend more than necessary for the repairs. In addition, Plaintiff asserts that the

Index 11 fuel injectors' incompatibility with the N54 engine's onboard computer caused a subsequent failure, which necessitated a further repair and replacement of the computer.  DiMartino does not provide dates for when he purchased the car or when he obtained the repairs in question, merely noting that the alleged defect affects certain models incorporating the N54 engine produced between 2006 and 2010.  DiMartino contends that BMWNA was aware of the incompatibility necessitating the switch to Index 11 fuel injectors, but only provided notice to dealers and service shops.  Customers were provided neither notice nor relief for this issue.  Plaintiff brings the instant action on behalf of a putative class of BMW car owners who purchased vehicle models with the N54 engine and have experienced the same defect and forced repairs.

## II.   STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if the plaintiff fails to state a claim upon which relief can be granted.  The moving party "bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005).  When considering a 12(b)(6) motion, the Court must accept as true all allegations in the complaint, and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff.  *See Evancho v. Fisher*, 423 F.3d 347, 350 (3d Cir. 2005); *see also Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008); *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997).

"[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  However, the plaintiff's "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id*.  Thus, the factual allegations in the complaint must be sufficient to raise a right to relief above the speculative level, such that it is "plausible on its face." *Id*. at 570; *see also Umland v. PLANCO Fin. Serv., Inc.*, 542 F.3d 59, 64 (3d Cir. 2008).  A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).  While "[t]he plausibility standard is not akin to a 'probability requirement' . . . it asks for more than a sheer possibility." *Id*.  "The inquiry is not whether plaintiffs will ultimately

prevail in a trial on the merits, but whether they should be afforded an opportunity to offer evidence in support of their claims." *In re Rockefeller Center Prop., Inc.*, 311 F.3d 198, 215 (3d Cir. 2002).

### III.  DISCUSSION

Since BMWNA seeks to have the Complaint dismissed in its entirety, the Court will tackle each count separately, starting with Defendant's argument that all of DiMartino's claims are time-barred.

#### A.  **Time-Barred Claims**

While a statute of limitations argument is generally an affirmative defense that is outside the scope of a motion to dismiss, the Third Circuit has permitted this defense to be raised in a motion under Rule 12(b)(6) when the limitations bar is apparent on the face of the complaint. *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014). BMWNA argues that DiMartino's inclusion of arguments in his Complaint regarding tolling the statutes of limitations is a tacit admission that at least some of his claims are indeed time-barred. The Court notes that Plaintiff neglects to provide any operative dates in the Complaint, including when he purchased the car or when he brought it in for repair. As such, the Court is unable to deduce when the limitations periods began to run.

Plaintiff raises a number of arguments as to why the statutes of limitations should be tolled, including the discovery rule, fraudulent concealment tolling, and estoppel. For the purposes of the instant motion to dismiss, however, DiMartino's reliance on the discovery rule is sufficient. The discovery rule delays the running of the statute of limitations "until the point where the complaining party knows or reasonably should know that he has been injured and that his injury has been caused by another party's conduct." *Skolas*, 770 F.3d at 251. The determination of this point is one of fact and best left to the fact-finder, unless there is no factual dispute regarding when the limitations began to run. *Id.* At the motion to dismiss stage, the Third Circuit "has stated, in the context of the discovery rule, that when the pleading does not reveal when the limitations period began to run . . . the statute of limitations cannot justify Rule 12 dismissal." *Skolas*, 770 F.3d at 251.

Plaintiff sufficiently alleges that the inherent incompatibility of the fuel injectors was not discoverable until the Index 10 fuel injectors failed and the vehicle was brought in for repairs. In addition, the Complaint alleges that

BMWNA was aware of the failure of the Index 10 fuel injectors as well as the incompatibility but failed to inform consumers of the issue. This further hindered discoverability of the harm. Without even a purchase date provided, it is not possible for the Court to determine so clearly "that reasonable minds cannot differ," when DiMartino's claim began to accrue or that it is barred by the statutes of limitations. *Skolas*, 770 F.3d at 251. Accordingly, the Court finds that DiMartino has not plead himself out of court and will deny BMWNA's motion to dismiss the claims under the applicable statutes of limitations.

**B.     Antitrust Standing**

BMWNA raises two separate arguments asking the Court to dismiss DiMartino's Sherman Act Section 2 claim (Count II): (a) that as an indirect purchaser Plaintiff and the putative class lack standing to maintain a federal antitrust action to the extent they seek monetary damages, and (b) that Plaintiff has failed to put forth a viable cause of action demonstrating antitrust injury.[1]

Section 4 of the Clayton Act states that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15(a). In a trio of cases, the Supreme Court limited the scope of this section confirming that "despite the broad wording of § 4 there is a point beyond which the wrongdoer should not be held liable." Accordingly, only the immediate buyer of a product—the direct-purchaser—has standing to maintain a federal antitrust action. *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968); *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199 (1990); *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). Underlying the Supreme Court's rationale was the risk of duplicative recovery, the complexity and inefficiency of apportioning damages between direct and indirect purchasers, and the need for effective enforcement of antitrust law. Most recently in *Warren General Hospital v. Amgen Inc.*, the Third Circuit noted the continued applicability of direct-purchaser standing and affirmed its status as a "bright line" rule in federal antitrust law. 643 F.3d 77, 96 (3d Cir. 2011).

BMWNA argues that its fuel injectors were never sold directly to consumers, but rather to dealers and authorized service providers (collectively,

---

[1] A third argument regarding DiMartino's standing for injunctive relief will be tackled separately in this section. *See infra* § B(iii).

4

"second-parties"). These second-parties then sold the fuel injectors to consumers when their vehicles were brought in for out-of-warranty repairs. (Complaint ¶ 4.) DiMartino does not dispute this chain of sale. Instead, he argues that the second-parties simply stocked the fuel injectors based on demand, making consumers the "direct purchaser." From this, DiMartino raises two distinct arguments: (i) that the legal theory in this case does not implicate the direct-purchaser standing rule or, in the alternative, (ii) that the Court should exempt Plaintiff's claim as it does not run afoul of any of the policy justifications underpinning this doctrine.

### i. Inapplicability of Direct-Purchaser Standing

For his first argument, DiMartino asserts that the direct-purchaser standing rule is inapplicable to the instant action, framing this doctrine as requiring an "overcharge" on an individual product. DiMartino argues that his alleged claim is instead based on an illegal tying "imposed by BMW . . . only on Plaintiff." (Pl.'s Resp. Opp. Def.'s Mot. Dismiss ("Pl.'s Opp."), ECF No. 15, at 8.) The Court finds this attempt to manufacture a distinction unpersuasive. For one, the direct-purchaser standing rule has been applied to illegal tying claims as well, including by the Tenth Circuit case extensively cited by Plaintiff. *See Sports Racing Servs, Inc. v. Sports Car Club of Am., Inc.*, 131 F.3d 874, 886 (10th Cir. 1997); *see also Warren Gen.*, 643 F.3d at 93 (applying the direct-purchaser standing doctrine to both an overcharge claim and an alleged illegal tying scheme). Moreover, DiMartino cites no case law to support his argument that the direct-purchaser standing doctrine should be limited to an individual product overcharge. DiMartino's contention that consumers are forced to purchase fuel injectors they do not need is a similar form of overcharge in the aggregate, stemming in both cases from an illegal tying scheme. (Complaint ¶ 47 (describing the illegal tying as resulting in BMWNA's ability to "impose what is in effect a 400% to 500% price increase."))

Similarly unconvincing is DiMartino's attempt to focus on the stage at which the alleged injury occurred. DiMartino contends that no real sale, and resulting antitrust violation, occurred until consumers were forced to purchase the extra fuel injectors due to the alleged incompatibility, making DiMartino (and other similarly situated plaintiffs) the "direct purchaser." In arguing that the Court should focus on the "breakdown in competitive conditions," DiMartino relies on the Tenth Circuit's opinion in *Sports Racing*. (Pl.'s Opp. at 9.) The Tenth Circuit found that the plaintiff's tying claim was not barred by the direct-purchaser rule

5

partly based on his purchase of racing services from the defendant and then being forced to purchase cars and parts from the defendant's distributor. *See Sports Racing*, 131 F.3d at 883. In explicitly noting that it was "not persuaded" by the Tenth Circuit's interpretation of the direct-purchaser rule, the Third Circuit distinguished *Sports Racing* on the basis that plaintiff's tying argument originated from the original purchase directly from the defendant, which required plaintiff "to purchase the tied product indirectly through a sub-dealership supplied by the defendant rather than through an independent source." *Warren Gen.*, 643 F.3d at 93 (quoting *Sports Racing*, 131 F.3d at 886-87) (noting in *Sports Racing* that plaintiff contended that the defendants required "anyone who purchased racing services (the tying product)—i.e. anyone who entered an SCCA race—to buy only cars and parts (the tied product) sold through [defendants' distributors].") With DiMartino having neither alleged that he bought the vehicle (the tying product) or the fuel injectors (the tied product) in question directly from BMWNA, the narrow and atypical situation recognized in *Sports Racing* is inapplicable here. *See Warren Gen.*, 643 F.3d at 93; *see also Link v. Mercedes-Benz of N. Am., Inc.*, 788 F.2d 918, 931 (3d Cir. 1986) (finding that repair customers were indirect purchasers of Mercedes, who allegedly required its dealers to purchase parts exclusively from it at inflated prices, which were then sold to customers by the dealers).

      DiMartino's argument is then no different than that raised by the plaintiff in *Warren General* and rejected by the Third Circuit. *See* 643 F.3d at 84 ("Warren General contends that it has direct purchaser standing under *Illinois Brick* because it is 'the first and only party in the distribution chain to be injured by Amgen's tying scheme.'") DiMartino's allegation that the second-parties were merely pass through entities for the final sale to the consumer does not obviate the fact that the fuel injectors went through at least one economic step from the manufacturer—to the second-parties—before they reached the consumer. *See id.* at 88 (noting that since the "purchases go through at least one other stage in the chain of distribution before reaching [plaintiff]," "there is no way of getting around the conclusion that [plaintiff] is the second purchaser in the chain of distribution"); *see also In re Hypodermic Products Antitrust Litig.*, 484 F. App'x 669, 675 (3d Cir. 2012) (affirming the district court's focus on the "economic substance" of the supply chain). This, in no uncertain terms, makes the second-parties the direct purchasers and forecloses DiMartino's standing to bring the instant antitrust claim.

### ii. Exception to Direct-Purchaser Standing

Alternatively, DiMartino argues that his antitrust claim should be exempted from the direct-purchaser standing rule. However, DiMartino does not point to any of the limited exceptions that have been recognized by the Supreme Court or the Third Circuit and its sister circuits. *See, e.g., Illinois Brick*, 431 U.S. at 726 n.2 (noting the potential for an exception to the rule where the direct purchaser enters into a cost-plus pricing contract with the indirect purchaser for a fixed quantity of goods, thus insulating the direct purchaser from any overcharge); *Link*, 788 F.2d at 931-32 (holding that in order to satisfy the co-conspirator exception plaintiff must join the alleged co-conspirators as co-defendants); *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363, 371 (3d Cir. 2005) (requiring that the defendant own or control the direct purchaser in order to apply the control exception). Instead, he requests that the Court provide something akin to a one-off exception to this "bright line" rule, based on the facts motivating this action. *Warren Gen.*, 643 F.3d at 95. DiMartino reasons that since the instant action would not run afoul of the policy rationales underlying the direct-purchaser standing doctrine, such an exception is warranted in this specific case.

The Supreme Court has cautioned against creating new exceptions, stating that "even assuming that any economic assumptions underlying the *Illinois Brick* rule might be disproved in a specific case, we think it an unwarranted and counterproductive exercise to litigate a series of exceptions." *UtiliCorp United*, 497 U.S. at 217. Nonetheless, even if the Court were to entertain considering a new exception, DiMartino fails to demonstrate that the policy rationales motivating the direct-purchaser doctrine are not relevant here. The Supreme Court articulated three policy concerns justifying the direct-purchaser standing rule: (1) a risk of duplicative liability and inconsistent adjudications; (2) potential evidentiary complexities and uncertainties from ascertaining the portion of the overcharge passed to the indirect purchasers; and (3) the dilution of ultimate recovery available to direct purchasers. *Illinois Brick*, 431 U.S. at 730-34.

DiMartino primarily hinges his argument on the issue of duplicative recovery, arguing that consumers are the "only one party" who would pursue a claim. (Pl.'s Opp. at 11.) However, "the fact that direct purchasers may choose not to institute antitrust actions of their own does not establish an exception to the *Illinois Brick* rule." *In re Microsoft Corp. Antitrust Litig.*, 127 F. Supp. 2d 702, 713 (D. Md. 2001) (citing *Illinois Brick*, 431 U.S. at 746). Additionally, as noted

in the Complaint, in order for consumers to be forced to buy more products it is axiomatic that the second-parties would have to purchase the additional fuel injectors from BMWNA first.  (*See* Complaint ¶ 21 (noting that BMW dealers and independent shops had to stock fuel injectors).)  Therefore, it follows that—just like customers allegedly had to buy more fuel injectors than necessary—the economic substance of the transaction would require the second-parties to similarly buy and stock more Index 11 fuel injectors due to the alleged illegal tying scheme, in the hopes that a customer coming in would purchase them.  This thus creates clear issues of duplicative liability and even dilution of any ultimate recovery available to the second-parties, should they bring suit.[2]  While the Court does not have before it the facts necessary to make a determination as to whether and how evidentiary complexities and ascertaining overcharge would be impacted, the Third Circuit has noted that failing to meet all the policy goals of *Illinois Brick* in a specific case is not sufficient to grant an exception.  *Warren Gen.*, 643 F.3d at 96.  For all these reasons, the Court will not endorse an exception to the "bright line" direct-purchaser standing rule in this case.

### iii. Standing to Seek Injunctive Relief

Having found that Plaintiff does not have standing to seek the monetary relief requested in Count II, the Court finds that DiMartino also lacks standing to seek injunctive relief based on the allegations in the Complaint.  DiMartino is correct that his indirect purchaser status does not bar him from seeking injunctive relief on his antitrust claim.  *See McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 856 (3d Cir. 1996).  However, in order to have standing sufficient to obtain injunctive relief, plaintiff must demonstrate a "(1) threatened loss or injury cognizable in equity; (2) proximately resulting from the alleged antitrust injury." *In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395, 400 (3d Cir. 2000).

---

[2] The Supreme Court's decision in *Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982), is inapplicable to the instant action.  In *McCready*, the plaintiff was obligated to make payments under her insurance plan to Blue Cross and it was these payments that she sought to recover in her suit.  Accordingly, the Supreme Court distinguished *Illinois Brick* since there were no other relevant actors in the economic chain.  The economic and distribution chain from BMWNA to the second-parties and then to the Plaintiff impinges on the very policy considerations raised in the Supreme Court's line of direct-purchaser standing cases and DiMartino has not alleged any form of direct relationship between the customer and BMWNA, as discussed above.  *See Hale v. Stryker Orthopaedics*, No. CIV 08-3367 (WJM), 2009 WL 321579, at *4 (D.N.J. Feb. 9, 2009) (noting that in that action "[b]etween Plaintiffs and Defendants in the chain of distribution stand several actors, including the hospitals performing the joint surgeries and Plaintiffs' insurers.")

DiMartino has not shown a "reasonable likelihood of future injury in this case." *McNair v. Synapse Grp. Inc.*, 672 F.3d 213, 225 (3d Cir. 2012). Plaintiff does not evince any intent to buy a new BMW. Moreover, based on his own allegations, it appears that such a vehicle would not include the alleged defects raised in the Complaint, as Plaintiff alleges that the Index 10 models were phased out and replaced by Index 11 fuel injectors. DiMartino attempts to remedy this in his opposition brief, arguing that he "could always in the future choose to purchase a car containing Index 10 fuel injectors." (Pl.'s Opp. at 38.) However, this after-the-fact effort to amend his Complaint is clearly improper. *See Com. of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988).

Therefore, because DiMartino does not have standing to maintain the instant federal antitrust action, the Court will not proceed to the remainder of BMWNA's arguments and will dismiss the antitrust count without prejudice.

### C. FDUTPA

The third count of DiMartino's Complaint pleads a cause of action under the FDUTPA. The FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). To state a claim, a plaintiff must allege "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Librizzi v. Ocwen Loan Servicing, LLC*, 120 F. Supp. 3d 1368, 1381 (S.D. Fla. 2015) (internal quotation marks omitted). In seeking to dismiss this claim, BMWNA argues that the Complaint has not alleged particularized facts sufficient to pass muster under Federal Rule of Civil Procedure 9(b). DiMartino argues in opposition that Rule 9(b) does not apply, since his cause of action argues an unfair or deceptive act by BMWNA and is not brought solely in fraud.

#### i. Rule 9(b) and the FDUTPA

Under Rule 9(b), "a complaint that alleges fraud is subject to [] heightened pleading requirements," and must "state with particularity the circumstances constituting fraud or mistake." *Morano v. BMW of North America*, LLC, 928 F. Supp. 2d 826, 832 (D.N.J. 2013). When FDUTPA claims "sound in fraud," courts are inclined to apply Rule 9(b). *Koch v. Royan Wine Merchants, Ltd.*, 847 F. Supp. 2d 1370, 1380-81 (S.D. Fla. 2012) (dismissing FDUTPA claim for failing to meet the particularity requirements of Rule 9(b) and citing in support a state appellate court that applied the analogous Florida rule of civil procedure to a FDUTPA

9

claim); *Stires v. Carnival Corp.*, 243 F. Supp. 2d 1313, 1322 (M.D. Fla. 2002) ("Most courts construing claims alleging violations of the Federal Deceptive Trade Practices Act or its state counterparts [FDUTPA] have required the heightened pleading standard requirements of Rule 9(b).")  *But see State of Fla., Office of Atty. Gen., Dep't of Legal Affairs v. Tenet Healthcare Corp.*, 420 F. Supp. 2d 1288, 1310 (S.D. Fla. 2005) (finding that the plaintiff's "failure to allege facts constituting fraud [was] not fatal to its [FDUTPA] claim," where "claim is not premised on allegations of fraud.")  Indeed, while recognizing that deceptive acts or unfair practices may "encompass[] a range of activities far broader than common law fraud," another court within this District has evaluated a FDUTPA claim based in fraud under Rule 9(b)'s heightened requirements.  *Morano*, 928 F. Supp. 2d at 833.

### ii. Application of Rule 9(b)

Rule 9(b) applies to the instant action because the Complaint not only sounds in fraud, but in fact directly alleges it.  (Complaint ¶ 56 (alleging that BMWNA "concealed" the alleged incompatibility of the fuel injectors and "engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment"); *see, e.g., Librizzi*, 120 F. Supp. 3d at 1381 (noting that the words "through deception," found in the plaintiff's amended complaint, was sufficient to support application of Rule 9(b) to the FDUTPA claim).  Even if Plaintiff had not explicitly used the word "fraud" in his Complaint, Rule 9(b) would be applicable nonetheless.  Courts have applied Rule 9(b) to allegations of misrepresentation, omission, deception, and unlawful inducing.[3]  *See, e.g., D.H.G. Properties, LLC v. Ginn Companies, LLC*, No. 3:09-cv-735-J-34JRK, 2010 WL 5584464, at *5 n.9 (M.D. Fla. Sept. 28, 2010) (noting that Rule 9(b) applied because the "crux" of the misrepresentation and omission allegations were primarily "grounded in fraud"); *Llado-Carreno v. Guidant Corp.*, No. 09-20971-CIV, 2011 WL 705403, at *5 (S.D. Fla. Feb. 22, 2011) (applying Rule 9(b) to FDUTPA claim that alleged fraud by "deceptively and unlawfully inducing" plaintiff to purchase the product in question).  Since DiMartino asserts "a series of alleged misrepresentations" under FDUTPA—grounding his claim in

---

[3] While in his opposition brief Plaintiff attempts to pivot his FDUTPA claim away from fraud by relying on his antitrust allegations, this *post hoc* rationalization cannot avoid the fact that the FDUTPA claim—at its core—sounds in fraud and therefore must meet Rule 9(b)'s requirements.

fraud—his Complaint must meet Rule 9(b)'s particularity requirements.  *D.H.G. Properties*, 2010 WL 5584464, at *5; (*see* Complaint ¶¶ 59-60).

### iii.  Meeting the Particularity Requirements

Having determined the applicability of Rule 9(b) to the instant claim, the Court now finds that the Complaint does not meet the Rule's particularity requirements.  In stating with particularity "the circumstances constituting fraud or mistake," DiMartino must support his allegations with the "who, what, when, where and how of the events at issue."  *Supreme Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 270, 276-77 (3d Cir. 2006).  "[A]t a minimum," this means that "plaintiff[] [must] support [its] allegations . . . with all of the essential factual background that would accompany the first paragraph of any newspaper story."  *In re Rockefeller Ctr. Properties, Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002) (internal quotation marks omitted).

In putting forth his FDUTPA claim, DiMartino relies on "broad statements" regarding BMWNA's alleged concealment of an incompatibility as well as "generic references" about Defendant "otherwise engag[ing] in activities with a tendency or capacity to deceive."  (Complaint ¶ 56); *Frederico v. Home Depot*, 507 F.3d 188, 200 (3rd Cir. 2007).  For example, Plaintiff alleges that BMWNA "concealed the incompatibility" between the Index 10 fuel injectors, the Index 11 fuel injectors, and the N54 computer system.  (Complaint ¶ 56.)  However, he fails to put forth anything more than boilerplate language in asserting such "unlawful trade practices," merely stating that BMWNA employed in some indeterminate manner "deception, [] fraud, misrepresentations, [] concealment, suppression, or omission"—legal conclusions unsupported by factual allegations.  (*Id.*); *see In re MobileMedia Sec. Litig.*, 28 F. Supp. 2d 901, 935 (D.N.J. 1998) (noting that even under a relaxed application of Rule 9(b) where factual information may not be available to a plaintiff "boilerplate and conclusory allegations will not suffice").

Where DiMartino has pled affirmative acts, by way of BMWNA "intentionally and knowingly misrepresent[ing] material facts," Plaintiff provides no specifics as to who made the alleged misrepresentations (BMWNA or one of the second-parties), what those statements were, or in fact when they were made (when the vehicle was purchased or brought in for repairs).  (Complaint ¶ 60); *see Supreme Specialties, Inc.*, 438 F.3d at 276 (noting that "Rule 9(b) requires plaintiffs to identify the source of the allegedly fraudulent misrepresentation or omission") (quotation and citation omitted).  Correspondingly vague are

DiMartino's allegations that BMWNA has been "promoting a scheme to defraud by . . . marketing its vehicles as safe, reliable, and of high quality," failing to point to any specific marketing or advertising materials. (Complaint ¶ 58); *cf. Morano*, 928 F. Supp. 2d at 834 (finding that plaintiff met the heightened pleading requirement of Rule 9(b) by pointing to specific language in marketing materials that would lead a reasonable consumer to be deceived).

Finally, as noted when discussing the potential time-barred nature of the claims, DiMartino provides no dates for when he purchased the vehicle or when and to whom he brought it in for repairs. Though this helps DiMartino stave off dismissal on statute of limitations grounds, it neglects to provide the requisite "precision or some measure of substantiation" to survive a motion to dismiss. *Frederico*, 507 F.3d at 200; *see, e.g., In re Amarin Corp. PLC Sec. Litig.*, No. CV136663FLWTJB, 2016 WL 1644623, at *18 (D.N.J. Apr. 26, 2016) ("[A]lleging that discussions 'likely' took place between two dates is insufficient to satisfy the heightened pleading standard of Rule 9(b)."). Without any of this factual support, Plaintiff's Complaint thus alleges mostly unsupported legal conclusions to bolster his FDUTPA claim. *See, e.g., Llado-Carreno*, 2011 WL 705403, at *5 (applying Rule 9(b) to an FDUTPA claim and finding that the plaintiff's complaint was "almost entirely legal conclusions with no factual elaboration.")

Based on the above, the Court concludes that these assertions "do not inject sufficient precision into the allegations of fraud." *Palmeri v. LG Electronics USA, Inc.*, No. 07–5706, 2008 WL 2945985, at * 3 (D.N.J. July 30, 2008). Thus, Defendant's motion to dismiss the FDUTPA claim is granted without prejudice.

D.   **Unjust Enrichment**

Lastly, DiMartino argues that BMWNA's scheme of forcing customers to purchase Index 11 fuel injectors due to the alleged incompatibility allows for the company to be unjustly enriched (Count I). BMWNA, however, correctly notes that this Court has previously denied claims of unjust enrichment by an indirect purchaser in a putative class action context. *See Weske v. Samsung Elecs. Am., Inc.*, No. CIV. 2:10-4811 WJM, 2012 WL 833003, at *7 (D.N.J. Mar. 12, 2012). Plaintiff's reliance on *Stewart v. Beam Global Spirits Wine, Inc.* to support his position is unavailing, as this Court previously considered and rejected *Stewart's* holding—preferring to join the majority of courts in this District. *See Fishman v. Gen. Elec. Co.*, No. 2:12-CV-00585 WJM, 2013 WL 1845615, at *6 (D.N.J. Apr.

12

30, 2013); *see also In re L'Oreal Wrinkle Cream Mktg. & Sales Practices Litig.*, No. CIV. 2:12-03571 WJM, 2013 WL 6450701, at *6 (D.N.J. Dec. 9, 2013). Therefore, BMWNA's motion to dismiss the unjust enrichment count is granted and the count is dismissed with prejudice.

## IV.  CONCLUSION

For these reasons, Defendant's motion to dismiss is **GRANTED WITH PREJUDICE as to Count I** and **GRANTED WITHOUT PREJUDICE as to Counts II and III**.  The Court grants Plaintiff thirty days to file an amended complaint consistent with this Opinion.  An appropriate order follows.

/s/ William J. Martini
**WILLIAM J. MARTINI, U.S.D.J.**

**Date: August 11, 2016**